# AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT

I, Adam Omansky, a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. Your Affiant, Adam Omansky, is a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice, within the meaning of Title 18, United States Code, Section 3051, that is an officer of the United States empowered by law with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States.

2. Your Affiant has been an ATF Special Agent for approximately one (1) year. Your Affiant's primary duties consist of the enforcement of federal firearms laws, armed narcotics trafficking, and conspiracy laws. Your Affiant has participated in numerous federal firearms and narcotics investigations as an ATF Special Agent in which narcotics and firearms used or possessed in violation of federal law have been recovered. Your Affiant also conducted and/or participated in such investigations as a sworn police officer in the State of Colorado. Prior to becoming an ATF Special Agent, Your Affiant was a Police Agent with the Lakewood Police Department (LPD) in Lakewood, Colorado for over 3 ½ years. As a Police Agent, Your Affiant was assigned to the patrol division. Your Affiant's duties involved responding to calls for service and proactive policing. Your Affiant has made over 140 felony and misdemeanor arrests during my tenure. Your Affiant investigated cases of serious violent crime to include but

1

not limited to, Robbery, Aggravated Assault, Narcotics Crimes, Unlawful Possession of Dangerous Weapons, and Unlawful Discharge of Firearms. Your Affiant has also investigated cases of property crimes including but not limited to, Burglary of a Dwelling, Burglary of a Business, 1st Degree Aggravated Motor Vehicle Theft and Criminal Trespassing.

3. Your Affiant has received training and instruction related to investigating armed drug traffickers and conspiracy laws. You Affiant works with and benefits from the knowledge of other law enforcement officers with decades of experience enforcing federal firearms laws, investigating armed drug traffickers and conspiracy laws. Your Affiant investigates violations of federal firearms laws and illegal firearms trafficking in the normal course of his duties and is familiar with the facts of this case.

## AFFIDAVIT PURPOSE

4. This affidavit is submitted to support a criminal complaint and application for an arrest warrant for and against Xavier DREW. As outlined herein, Your Affiant submits that there is probable cause to believe that defendant Xavier DREW, *a/k/a "Flock", a/k/a "Billy"* has committed the following violations of federal law:

**Count 1**: *Conspiracy to Distribute and to Possess with Intent to Distribute Methamphetamine and Fentanyl*

From on or about October of 2022, up to an including and April 27, 2023, in the State and District of Colorado and elsewhere, the defendant, Xavier DREW, *a/k/a "Flock", a/k/a "Billy",* and others both known and unknown to the United States, did knowingly and intentionally combine, conspire, confederate and agree, with interdependence, to distribute and to possess with the intent to distribute 500 grams and more of a mixture and substance containing

a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(A)(viii); and 400 grams and more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl), a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(A)(vi).

All in violation of Title 21, United States Code, Section 846.

**Count 2**: *Possession of a Firearm During and in Relation to a Felony Drug Trafficking Offense*

On or about November 30, 2022, in the State and District of Colorado, the defendant, Xavier DREW, *a/k/a "Flock", a/k/a "Billy"*, did knowingly use and carry a firearm during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, namely a violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii), (b)(1)(A)(vi) and 846, as alleged in Count One herein, and did possess a firearm in furtherance of that same offense.

All in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

**Count 3:** *Unlawful Transfer and Possession of a Machine Gun*

On or about February 3, 2023 and March 1, 2023, in the State and District of Colorado, the defendant, Xavier DREW, *a/k/a "Flock", a/k/a "Billy"*, did knowingly and unlawfully possess and transfer machineguns, to wit: "Glock Switches", which are capable of converting Glock and similar style semi-automatic firearms into fully-automatic firearms, and said machineguns were not registered to defendant Xavier DREW in the National Firearms Registration and Transfer Record.

All in violation of Title 18, United States Code, Sections 922(o) and 924(a)(2).

5. The facts in this affidavit come from my personal observations, interviews, police reports, body camera footage, my training and experience, and information obtained from other agents, law enforcement officials, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrants and does not set forth all of my knowledge about this matter.

## INVESTIGATION

6. In October of 2022, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) began an investigation into an armed narcotics trafficking criminal street gang in the Denver, Colorado area, stemming from information obtained from a Source of Information [hereinafter referred to as "the SOI"]. (The SOI has been given monetary compensation in exchange for giving law enforcement reliable information on criminal activities on several prior occasions. He/she is not trying to reduce any sentence in exchange for their current cooperation. Your affiant is not aware of any circumstances wherein the SOI has provided intentionally false or misleading information, and information provided by this individual has been corroborated through independent investigative practices.)

7. On October 3, 2022, ATF SA Adam Omansky and Joseph Acosta met with United States Postal Inspection Service (USPIS) Task Force Officer (TFO) Louis Guida and the SOI. The SOI informed investigators of a violent criminal street gang distributing narcotics in the area of North Broadway and E. Colfax Ave. in Denver, Colorado.

8. The SOI stated that an individual herein identified as R.W. had provided the SOI with a phone number to use to obtain Xanax. The SOI reported that on or about September 4, 2022, he had contacted that number, 219-545-0752, and arranged to do a deal. (This was prior to the SOI's cooperation with law enforcement.) The SOI was told to travel to a location at 2337 S. Blackhawk St. When the SOI arrived at the location, R.W. (not the owner of the phone) came out of the stairwell of the building located at 2367 S. Blackhawk St. According to the SOI, R.W. offered the SOI firearms for sale and told the SOI they had access to Glock "switches". Based on your Affiant's training and experience, I know that "switches" is a term used to describe devices that can be inserted into firearms to convert them from semi-automatic firearms into fully automatic machine guns. The "Glock Switches" discussed herein are specifically designed to convert Glock and similar style semi-automatic firearms to fully automatic weapons. The SOI had engaged in previous conversations with R.W. about firearms sales.

9. Using public information and law enforcement databases SA Omansky identified the phone number 219-545-0752 as belonging to Xavier DREW (DOB: XX/XX/94).

10. According to the SOI, they contacted an individual, later identified as Xavier DREW, *a/k/a "Flock", a/k/a "Billy",* at telephone number 219-545-0752 [hereinafter referred to as "DREW's phone number"] and subsequently met directly with DREW on several occasions in September of 2022 to purchase Xanax. According to the SOI, DREW advised he could source the SOI with methamphetamine and fentanyl. DREW also offered the SOI multiple firearms for sale.

11.  On November 30, 2022, at the direction of ATF SAs, the SOI engaged in conversation with DREW using the DREW's phone number. Pursuant to that conversation, a meeting was arranged.

12.  On November 30, 2022, ATF SA5115, working in an undercover capacity [hereinafter referred to as "UC1"] and the SOI, conducted an undercover controlled purchase from DREW at the Waffle House located at 12880 E. Mississippi Ave., Aurora, CO 80012. During the meeting, UC1 paid DREW $600.00 for a TAURUS G2S 9mm pistol bearing serial number ADE302135 (Fig. 1), $300.00 for approximately 100 suspected fentanyl pills (Fig. 2), and $1,300.00 for a Glock 17 Gen4 9mm pistol bearing serial number BHGC456 (Fig. 3). During the meeting, DREW was armed with the Glock pistol while he sold UC1 the TAURUS pistol and suspected fentanyl pills. DREW told UC1 the Glock was for his (DREW's) protection. Later during the meeting, DREW sold UC1 that Glock pistol. During the transaction, DREW told UC1 he was expecting two more Glock pistols and if he received them, he would sell them to UC1. DREW told UC1 that fentanyl pills were $3.00 a pill, but he would lower the price if UC1 purchased higher quantities. DREW also stated he could provide UC1 with Glock switches. Subsequent examination of DREW's personal Glock firearm, which he sold to UC1 during this transaction, confirmed that it both met the definition of a "firearm" under federal law and functioned as designed.

//

//



(Fig. 1)                (Fig. 2)                (Fig. 3)

13.  Between December 12, 2022, and December 13, 2022, UC1 and DREW (using DREW's phone number) engaged in conversation discussing the purchase of firearms and fentanyl.  On December 13, 2022, UC1 conducted an undercover controlled purchase from DREW at a location in Denver, Colorado.  DREW arrived at the location accompanied by two other individuals, herein identified by the initials D.M. and R.M. During that transaction, UC1 purchased: one Anderson Manufacturing, model AM-15, .556 caliber, semi-automatic pistol, bearing S/N: 20240201 (Fig. 4); one privately made firearm (PMF), a semi-automatic pistol, bearing no identifiable markings or S/N (Fig. 5); one SCCY Industries, model CPX-2, .9mm caliber, semi-automatic pistol, bearing S/N: 462278 (Fig. 6); and 101 suspected fentanyl pills (Fig. 7) from DREW for a total of $2,900.  PMFs with no serial numbers are also commonly referred to as "ghost guns".

//


//

7



(Fig. 4)    (Fig. 5)

(Fig. 6)    (Fig. 7)

14.  Following the December 13, 2022, transaction, DREW reached out to UC1 to see if UC1 could help him to source powder cocaine.  On January 3, 2023, UC1 and DREW (using Drew's phone number) engaged in conversation for the purpose of arranging an in-person meeting to discuss DREW's interest in acquiring cocaine from UC1.  DREW ultimately agreed to meet on January 4, 2023, at an ATF controlled location.

15.  On January 4, 2023, prior the meeting, UC1 received a phone call from DREW (using the Drew's phone number) wherein DREW asked UC1 if he was interested in purchasing an old shotgun.  UC1 advised that he was not interested, and DREW then stated that he also had a .38 special for sale if UC1 was interested.  UC1 stated he was, and DREW affirmatively acknowledged.

16.  On the same date, UC1 conducted an undercover controlled purchase from DREW at a location in Denver, Colorado.  DREW arrived at the location accompanied by R.W.

DREW followed UC1 inside the location while R.W. remained outside. UC1 asked DREW how much [cocaine] he was seeking to purchase from UC1. DREW advised that he normally purchases "a four and a baby", which in this context, is a street vernacular term commonly used to refer to 1/8 of a kilogram (four full ounces plus 13 grams, which is just short of a half-ounce – approximately 125 grams) of cocaine. UC1 affirmatively acknowledged and then explained that he needed to know how much cocaine DREW could distribute, and that it was important because there could be no misunderstandings with the organization UC1 worked for. DREW affirmatively acknowledged and UC1 then asked him how much he previously paid for the "four and a baby", to which DREW stated "three" [$3,000.00].

17. DREW told UC1 that he could sell a "four and a baby" of cocaine in three (3) days and further stated that he would even purchase "a nine" if the price was right. In this context, "a nine" is a street vernacular term commonly used to refer to (nine ounces (252 grams), which is approximately a quarter (1/4) kilogram – 250 grams) of cocaine.

18. DREW then advised UC1 that he had a "hard plug" for the "blues" (fentanyl pills), which in this context, is a street vernacular term commonly used to refer to a steady source of supply (SOS). Based on SA Omansky's training and experience he is familiar with the term "blue" or "blues", which in this context, is commonly used street vernacular term to refer to fentanyl pills. Fentanyl pills are commonly made to look like blue oxycodone pills with the imprint "M30". UC1 then asked DREW the sale price for "a boat" of pills, which DREW advised would be $2,000.00. In this context, "a boat" is a street vernacular term commonly used to refer to 1,000 pills. DREW further advised UC1 that as UC1 purchased higher quantities, the price would be reduced.

19.     DREW then asked UC1 when he could source the cocaine and UC1 advised that he needed time to place an order because all of the cocaine that was maintained in the stash houses was already bought and paid for. DREW stated all he needed to do was make a call to his SOS for the pills and he would be ready. DREW further stated that he was currently in possession of about 3,000 pills and that he shipped the pills out state to places such as Ohio, Omaha (NE), Chicago, (IL), and Gary (IN). DREW stated that he could charge between $15.00 and $20.00 per pill in Chicago and Gary.

20.     DREW then retrieved a revolver from his jacket pocket and placed it on the desk for UC1 (Fig. 8). UC1 physically and visually inspected the revolver as UC1 asked DREW how much he wanted to sell it for. After some negotiation, DREW agreed to sell the revolver to UC1 for $350.00. DREW sold the revolver to UC1.



(Fig. 8)

21.     Between January 30, 2023, and February 1, 2023, UC1 and DREW, using DREW'S phone number, engaged in conversation discussing a fentanyl transaction. On February 1, 2023, DREW met the UCs at a location in Denver, CO. DREW arrived in a ride sharing vehicle and was subsequently dropped off at the UC location at approximately 2:58 p.m. The UCs conducted an undercover controlled purchase from DREW. During the meeting, UC

SA3997 (hereinafter referred to as UC2) paid DREW $2,200 of pre-recorded U.S. currency/ATF buy money for the purchase of approximately 1000 (111 grams) suspected fentanyl pills. During the meeting DREW discussed his narcotics operation with the UCs. DREW stated he sends and causes to be sent fentanyl to Wyoming through the mail. DREW offered to mail the UC narcotics in Wyoming. DREW said he has five (5) other people helping him send parcels. DREW said he is the only one in his group who handles larger quantities of narcotics. DREW said the members of his group "don't know how to act". DREW told the UCs that all of their transactions would be handled through him. DREW said he accepts payments for narcotics using CashApp, Walmart to Walmart, or directs others to pick up physical U.S. currency. DREW said CashApp has a reporting requirement at $10,000 so he stops at $7,000 to avoid the reporting. DREW said he also spreads the payments through multiple CashApp accounts. DREW explained that the UC did not need to pay for the fentanyl until they received the "green" USPS notification that the parcel was delivered. DREW explained he has a connection at a vehicle rental place who helps him change his vehicles multiple times. DREW said he pays this person with Fentanyl. DREW explained he uses these vehicles as "clean" vehicles to avoid police detection. DREW said he uses "Signal", "Whatsapp", and "Telegram" encrypted messengers to avoid law enforcement obtaining messages. The following is a photograph of the suspected fentanyl pills purchased from DREW on February 1, 2023 (Fig. 9).,

//



(Fig. 9)

22. On February 3, 2023, DREW, using DREW'S phone number, contacted UC1 and informed the UC that DREW had something "good" for them. UC1 directed DREW to contact UC2. DREW contacted UC2 from DREW's phone number. DREW agreed to meet UC2. On February 3, 2023, DREW met UC2 at a UC location in Denver, CO. DREW arrived at the UC location driving a Chevrolet Cruze not registered to him. DREW was accompanied by an unknown individual. Two (2) additional males arrived in an Uber and entered DREW's Chevrolet Cruze. DREW then exited the Chevrolet Cruze and entered the UC location. DREW provided UC2 with five suspected machine-gun conversion kits, also known as "Glock switches", a Privately Made Firearm (PMF) "Ghost Gun", and a suspected silencer. DREW explained that the Glock switches were from his associate, and he was not sure how to attach them to the PMF. DREW requested payment for brokering the transaction and a separate payment to his associate for $2,500 for the cost of the Glock switches, Ghost Gun, and suspected silencer. UC2 paid DREW $500 dollars for brokering the transaction. DREW then placed a phone call and instructed the party on the other end of the call to come inside. A male, believed

to be R.M., exited the vehicle, and entered the UC location. R.M. was wearing a full-face mask in an attempt to conceal his identity. R.M. proceeded to install a Glock switch on the PMF, converting the weapon to a suspected machine gun. R.M. then left the UC location leaving DREW with UC2. DREW collected the $2,500 of pre-recorded U.S. Currency/ATF buy money for the purchase of: the four suspected machine-gun conversion kits "Glock switches"(ATF Property Items 16, 17, 18,19); the Privately Made Firearm (PMF) "Ghost Gun" affixed with the machine-gun conversion kit (ATF Property Item 15); and the suspected silencer (ATF Property item 21). These ATF Property Items were submitted to the ATF Firearms and Ammunition Technology Division (FATD). The following determination was made: ATF Property Items 16, 17, 18, 19, are all Glock-type machinegun conversion devices, therefore, they each qualify as a "machinegun" under 26 U.S.C. § 5845(b). ATF Property Item 21 is a firearm silencer. ATF Property item 15 was verbally determined, by examining photographs, to be a PMF firearm with a Glock-type machinegun conversion device attached.

23. Between February 21, 2023, and February 22, 2023, UC2 and DREW, using DREW's phone number, engaged in conversation discussing the purchase of fentanyl. DREW contacted UC2 from the DREW's phone number and agreed to mail UC2 2,000 fentanyl pills. The pills were to be sent to a UC P.O. Box in Wyoming. DREW agreed to a price of $2,200 dollars per 1,000 fentanyl pills. DREW also stated he had additional items for UC1. DREW had previously provided machine gun conversion kits, a suspected silencer, and a suspected machine gun to ATF UCs. It was believed that DREW had additional firearms and machine gun conversion kits.

24. Between February 24, 2023, and February 28, 2023, UC2 and DREW, using DREW's phone number, engaged in conversation discussing DREW mailing the fentanyl to UC2. DREW confirmed he mailed UC2 the fentanyl. UC2 advised that, at a later date, they would pay DREW for the mailed fentanyl and the other items DREW had for sale. DREW agreed to meet UC2 on March 1, 2023.

25. On February 25, 2023, Postal Inspector King responded to a processing facility in Denver, CO and located the parcel DREW had mailed to UC2. The parcel bore a USPS Priority Mail tracking number 9505 5111 6142 3055 2166 86 (Subject Parcel 4). Subject Parcel 4 is described as being packaged in a 2023 Valentine's Day Box, dimensions 8.2" x 7.4" x 8.4". It weighed 1 pound and 10 ounces. Subject Parcel 4 was addressed to "Jessie Anderson, XXXXXXX, XXXXX, WY, XXXXXX[1]" and had the return address of "Anthony Wilson, 2515 S Cimarron, St, aurora CO, 80014". Postage for Subject Parcel 4 ($10.55) was paid for with cash. Postal Inspector King reviewed USPS surveillance footage from the mailing of Subject Parcel 4 which shows DREW mailing Subject Parcel 4.

26. On February 27, 2023, Postal Inspector King, SA Omansky, and SA Acosta opened Subject Parcel 4. Investigators found approximately 2,000 round blue pills marked "M30" which are suspected to contain fentanyl. The weight was approximately 232.2 grams.

27. UC2 subsequently made arrangements to meet with DREW to pay for the pills that were mailed to the P.O. Box in Wyoming. On March 1, 2023, DREW met UC2 at a UC location in Denver, CO. DREW arrived at the UC location driving a black Dodge Durango not

---

[1] The UC P.O. Box address has been redacted to maintain operational security. The address provided to DREW was the address to which DREW sent the suspected fentanyl pills.

registered to him. DREW was accompanied by another individual. UC2 paid DREW $4,400 dollars in pre-recorded USPIS buy money for the suspected fentanyl DREW mailed. DREW then provided UC2 with two (2) machine gun conversion kits (**ATF Property Items 24 and 25**), a Privately Made Firearm (PMF), a .40 caliber pistol bearing no serial number and a Para-Ordnance MFG., model P10, .45 caliber pistol, with an obliterated serial number. For the firearms, UC2 paid DREW $2,500 dollars in pre-recorded ATF buy money. UC2 then asked DREW if he had additional fentanyl pills in his possession that he could provide to UC SA6373 (hereinafter referred to UC3), who was also present at that location. DREW exited the UC location and returned to the black Dodge Durango. DREW subsequently returned to the UC location and provided UC3 with approximately 100 suspected fentanyl pills in exchange for $300 dollars in pre-recorded ATF buy money. DREW told UC2 that he had access to methamphetamine that he could sell to the UCs. DREW also told UC2 that he could increase the amount of fentanyl sent to UC2 and all DREW needed to do was let his Source of Supply (SOS) know. These exhibits were submitted to the ATF Firearms and Ammunition Technology Division (FATD). The following determination was made: ATF Property Items 24 and 25, are Glock-type machinegun conversion devices, therefore, are each a "machinegun" under 26 U.S.C. § 5845(b). Additionally, each of the weapons that were purchased meets the definition of a "firearm" under federal law.

28. Between March 27, 2023, and March 30, 2023, UC2 and DREW (TARGET TELEPHONE) engaged in conversation discussing DREW mailing the fentanyl to UC2. On March 27, 2023, DREW contacted UC2 from the DREW'S phone number asking UC2, "Did y'all need more?" Throughout the investigation DREW has sold ATF UCs narcotics and

firearms. Based on the context of this statement, investigators believe DREW was asking UC2 if he wanted more narcotics. DREW and UC2 discussed mailing fentanyl to UC2. DREW agreed to mail UC2 fentanyl to a USPIS UC P.O. Box. On March 30, 2023, UC2 contacted DREW at telephone DREW's phone number. DREW told UC2 he had 2,000 fentanyl pills and a ½ pound of methamphetamine. DREW said he would sell the fentanyl to UC2 for $2,400.00 per 1,000 pills and $175.00 per ounce of methamphetamine. UC2 and DREW agreed to meet later on that same date.

29. On March 30, 2023, at approximately 3:01 p.m., DREW met UC2 at a UC location in Denver CO. DREW arrived at the UC location in a ride share vehicle. DREW contacted UC2 from the DREW'S phone number and informed UC2 he had arrived. DREW entered the UC location and subsequently sold UC2 approximately 232 grams of suspected methamphetamine (which subsequently tested presumptive positive for the presence of methamphetamine). UC2 paid DREW $1,400 dollars in pre-recorded ATF buy money for the suspected methamphetamine. DREW then sold UC2 approximately 2,000 (218 grams) suspected fentanyl pills. UC2 paid DREW $4,400 dollars in pre-recorded ATF buy money for the suspected fentanyl.

30. Between April 14, 2023, and April 17, 2023, UC2 and DREW (using DREW's phone number) engaged in conversation discussing DREW providing additional firearms and narcotics to UC2. DREW agreed to meet UC2 on April 17, 2023, to sell UC2 both firearms and narcotics.

31. On April 17, 2023, DREW and R.W. arrived at the UC location in Denver, Colorado. R.W. exited the vehicle and walked around the UC location. DREW subsequently sold

UC2 approximately 122 grams of suspected methamphetamine (which tested presumptive positive for the presence of methamphetamine), approximately 1,000 (114 grams) suspected fentanyl pills, and an Anderson Manufacturing, Model AM-15, Multi Caliber AR style pistol, with an obliterated serial number. Additionally, during the UC purchase, DREW openly told UC2 about nearly getting into an accident in his vehicle the previous night. DREW told UC2 that he and another male were going to shoot the other people involved in the incident. DREW explained that the only reason they did not shoot the other parties was because DREW had a female in his vehicle at the time.

32. Between April 23, 2023, and April 24, 2023, UC2 and DREW, using DREW'S phone number, engaged in conversation discussing DREW mailing the fentanyl to UC2. DREW agreed to mail UC2 fentanyl to a UC P.O. Box in Wyoming for the price of $2,200 per 1000 fentanyl pills. On April 24, 2023, DREW confirmed they mailed 3,000 fentanyl pills to UC2. DREW texted UC2 a picture of United States Postal Service (USPS) Priority Mail receipt with tracking number 9505 5123 7244 3114 8005 10. UC2 advised that they were out of town and, at a later date, UC3 would pay DREW for half of the mailed fentanyl. DREW agreed to meet on April 25, 2023.

33. On April 24, 2023, Investigators located USPS subject parcel with tracking number 9505 5123 7244 3114 8005 10. The parcel was opened. Investigators found approximately 3000 (329.9 grams) suspected fentanyl pills (Fig. 10).



(Fig. 10)

34.     On April 25, 2023, UC2 made arrangements for DREW to meet with UC3 to pay for the pills that were mailed to the P.O. Box in Wyoming. On April 25, 2023, DREW met UC3 at a UC location in Denver, CO. UC3 paid DREW $3,300 dollars in pre-recorded USPIS buy money for the suspected fentanyl DREW had mailed. DREW told UC3 he could source ½ pound of methamphetamine for UC3 at a later date.

35.     On April 26, 2023, at approximately 9:58 p.m., USPIS Inspectors listed USPS subject parcel with tracking number 9505 5123 7244 3114 8005 10 in the USPS system as available for pickup. On April 27, 2023, at approximately 8:45 a.m., USPIS Inspectors listed USPS subject parcel with tracking number 9505 5123 7244 3114 8005 10 in USPS system delivered.

36.     On April 27, 2023, DREW using DREW's phone number, communicated with UC2 notifying them the parcel was delivered. UC2 subsequently made arrangements for DREW to meet with UC3 to pay the other half for the pills that were previously mailed to the P.O. Box in Wyoming on April 24, 2023.

37.     On April 27, 2023, at approximately 4:01 p.m., DREW using DREW'S phone number, contacted UC3. DREW told UC3 he was out of town and he was sending his girlfriend to meet UC3 at a UC location in Denver, CO. DREW told UC3 that his girlfriend had the ½ pound of methamphetamine DREW previously agreed to sell to UC3. DREW told UC3 they owed $4,700 for everything. DREW told UC3 that the methamphetamine was $1,400 dollars and that they still owed $3,300 for the fentanyl that had been mailed to the P.O. Box in Wyoming on April 24, 2023. At approximately 4:42 p.m., DREW contacted UC3 notifying them his girlfriend arrived. A female, herein identified by the initials L.M., D.O.B. (XX/XX/03), met UC3 and entered the UC location. L.M. subsequently sold UC3 approximately 283 grams of suspected methamphetamine (which tested presumptive positive for the presence of methamphetamine). UC3 paid MORRIS $3,300 dollars in pre-recorded USPIS buy money for the previously-mailed suspected fentanyl and $1,400 dollars in pre-recorded USPIS buy money for the suspected methamphetamine.

38.     Based on safety protocols related to fentanyl, presumptive testing is generally referred to a laboratory as opposed to being performed in the field. This can delay test results. However, investigators are familiar with the appearance of fentanyl pills which are commonly being distributed on the street. Based on agents' training and experience, the pills that have been purchased within this investigation are consistent with the counterfeit blue M-30 pills that are commonly distributed by illegal fentanyl dealers in Denver and elsewhere.

39.     The narcotics seized and/or purchased in this investigation are pending laboratory testing at this time. Additionally, your affiant has performed a search of the National Firearms Registration and Transfer Record (NFRTR) and has determined that none of the Glock switches,

which constitute machineguns as outlined herein, have been register to Xavier Drew, as required by law.

## CONCLUSION

40. Your Affiant submits that there is probable cause to believe that on or about November 30, 2022, through on or about April 27, 2023, in the State and District of Colorado, the defendant, Xavier DREW committed the Subject Offenses, as alleged herein.

41. As such, your Affiant respectfully requests that the Court issue a criminal complaint and corresponding arrest warrant for and against Xavier DREW.

I, Adam Omansky, Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, hereby depose and state that the above-mentioned information is true to the best of my information, knowledge and belief.

*s/ Adam Omansky*
Adam Omansky
ATF Special Agent

Submitted, attested to, and acknowledged by reliable electronic means this __29th__ day of April, 2023, Denver, Colorado.

_____
HON. Michael E. Hegarty
UNITED STATES MAGISTRATE JUDGE

**Affidavit was reviewed and is submitted by Bradley Giles, Assistant United States Attorney**